The appellant believes that the analysis of this case starts with the recognition that the products at issue have three components. There is a musical recording component of a type which everyone agrees is covered by the compulsory license. There is another component which consists of a collection of still photographs which are licensed by the appellant from a third party. The third component is alphanumeric consisting of song lyrics analogous to the lyrics which one might find in a CD liner note and which are published without license. In fact, the lyrics are published on the websites of the publishers and made available to the public, presumably for substantially unfettered use. Well, the essence of your case, as I understand it, is that you come within the definition of a phono record. Is that correct? Yes, Your Honor. And what do you do with the exclusion in 115 for audiovisual works? Well, I guess the question is why is it not an audiovisual work? And that is because an audiovisual work... The problem here is that the industry has coined a lot of terms and customs, but they don't have anything to do with the law. The law defines audiovisual work. It is not merely a work with audible and visual components. It doesn't even need an audible component. Audiovisual work replaced the nine-act term motion picture. That was a 1909 statute, obviously, and the court wanted... The framers of the act wanted to have a more theoretical approach to copyright law. If you go back to the 1790 act, there were enumerated areas of copyright protection. Very, very limited. And then as things happened throughout the 19th century, specific things were added. Lithographs were added in the early 1800s. Photography in the 1860s or thereabout. Motion pictures were added somewhat later in the early 1900s, I believe. And people felt, well, you really didn't even have to put them in there specifically because they were really photographs. Kind of an interesting case. Admittedly, this is not our circuit's case, but APCO Music, why do you disagree with the reasoning of that case? They didn't look at the law, Your Honor. They didn't read the definition of audiovisual work. They saw the words audiovisual. They saw industry custom of music or audible component and a visual component. And they said, okay, anything that has audio and visual is audiovisual. And that's what the court below did. They just followed and adapted that. And they even defined a device as an audiovisual device. Completely unrelated to the question before the court, which is, is it an audiovisual work under the Copyright Act of 1976? And the sine qua non of an audiovisual work is a series of related images. Now, there were a number of other requirements in the division, but you must have a series of related images. Why don't you have that with the lyrics here? Let's talk about what a related image is, Your Honor. Well, let's talk about why you don't have it with the series of lyrics here. We don't have it because we have a random collection of images of licensed work from other people. What makes them random as opposed to a series, a connected series? Let's go back to the Ninth Act. Motion picture, broader term. I'm willing to go back there, but I want to stay within the last hundred years as quickly as we can. Certainly, Your Honor. Related means related. It doesn't mean merely collected together. The Copyright Act has a concept of a collective work. Related does not mean merely collected together. Otherwise, it would have no meaning at all. Well, don't lyrics, which have a start and a finish, by definition have some sort of connectedness? They're not just random words. Absolutely. Although some songs appear to be just random words. Correct. But does a dictionary become an audiovisual work? Well, you don't read a dictionary from the front page to the last. But the lyrics here, you have to really use them from the beginning to the end to make any sense of your device and the lyrics used in your device, don't you? Let's take a novel or a literary work, which we know is different from an audiovisual work. Well, that's an important question I want to ask you. Doesn't the definition of literary work include the concept that it can be contained within audiovisual work under the statute? It certainly can be embodied as a phonorecord because the statute specifically says that. So what the statute is telling us is that the definitions are content driven, not technology driven. Now, a literary work is read from front to back in sequence. And certainly one could say that if one made a series of images of a literary work, that they would be related. And I think they would be even more related than random visuals that accompany karaoke, if you've ever seen them, Your Honor. They've got a picture of a sunset, a couple kissing. I would say completely unrelated, but in a sense related, but certainly less related than the sequential images of pages of a book. Is it your position then that if the sequential images of the lyrics, and by sequential I mean in the order they're sung, that if those are literary works that they cannot be audiovisual at the same time, that they're exclusive of each other, those two definitions in the statute? Your Honor, I don't have a position on that per se. I think it's unrelated to the case in the sense that the question is whether it's an audiovisual work, and there must be a sequence of related images. Now, in a motions picture sequence, we know what the relationship is. The relationship synthesizes motion from one millisecond in time to another. If we remove one frame, because we know the relationship, we can fill in the missing frame by looking at the two adjacent frames. That's a relationship that we can understand in a series of images. And remember, the series of images must have the relationship. They must define a relationship. There is no relationship between random scenes of sunsets, people running toward each other, flowers, rivers and streams, and a wedding party, for example, which might be in a typical karaoke image sequence, that we can define, other than saying that they have been put together as a collective work. And we're not saying that the lyrics are not a collective work. We're not saying that they're not entitled to some measure of protection, or at least consideration for protection under the copyright law. We're not saying that. I'm not so concerned about the images that you've described, the sunsets and couples kissing, as the visual depiction of the song lyrics, whether those constitute a series of related images. If the court were to accept that, then a literary work would become an audiovisual work. And that was my earlier question, whether you view those as mutually exclusive somehow, that if it meets the definition of literary work, somehow by definition it cannot also meet the definition of audiovisual work. I believe the definitions are meant to be mutually exclusive under the law, Your Honor, because the law goes to a great trouble to define all these different types of works, and to accord different packages of rights to them. So I believe it would be against the intent of the framers to blend all of their, or many of their categories into the category of an audiovisual work, which is what would happen. Literary works would become audiovisual works if we put them on a computer and read them on a computer. But isn't that indeed what the statute contemplates, counsel? When you look at 101, I'm just reading a portion here, literary works are, in quotes, works other than audiovisual works expressed in words and so on. It seems to contemplate that literary works can be part of audiovisual works, does it not? Well, the statute does mention discs with respect to literary works, but it says regardless of the nature of the material objects. So I think what the statute is clearly telling us is that regardless of the nature of the material objects, within which the particular work is embodied, we've got to look at the content. And the content definition is works other than audiovisual works, expressed, and so I guess they are mutually exclusive, expressed in words, numbers, or other verbal or numerical symbols or indicia. Doesn't other than audiovisual works carve out the use of literary works within the context of an audiovisual display? I guess the question which Your Honor is asking is a book that is being read. Well, I don't know. I guess the question is if a book is being displayed as sequential pages, it's not an audiovisual work expressly under the definition of literary work. Yeah, isolated, that's right. But the question is if you have a literary work as used in the karaoke situation where you have music and the words that are being sung being shown in a related fashion, does that not take a literary work as defined under the statute and put it into the audiovisual category? I'm afraid I'm not following your argument, Your Honor. I think the statute is saying that literary works are words, basically words and numbers, regardless of the material object in which you're embodying. But it says other than audiovisual works. Does it not? Yes, it does. So if that's to have any meaning at all in the statute, then the Congress was talking about the use of materials that might normally be considered literary works, but in the context of their use with audiovisual works. It takes them out of that. Isn't that correct? I believe the statute appears to be referring to movie scripts and things of this nature. Well, it certainly includes that. But do you not agree that this statute is an old statute? It didn't contemplate all of the technology that currently exists. I think you even alluded to that. You agree with that, right? Yes, I do. So what we're really trying to do is to construe the intent of Congress in drafting this law as technology has gone along. In this particular case, we've got literary works, or lyrics in this case, being shown on a screen in a related fashion to the music. I mean, it's exactly synchronously timed so that someone who looks up there can see it and sing along. Isn't that correct? Yes, it is, Your Honor. So what is unreasonable about interpreting or construing that as an audiovisual work? It's audio in the sense that there is sound involved. It's visual in the sense that you see it. You've got the lyrics up there on the screen. It's obviously an essential component of this whole mechanism. As was indicated previously, the pictures probably are not that way. They're somewhat random. But the music being up there seems to me to be an essential component of your client's product. Isn't that correct? Music is an essential component of the product and the lyrics. However, music is not an essential component of an audiovisual work. I understand that, but it is audio, right? It is sound. It is audio. So really we're talking about the difference in the technology that didn't exist when the statute was drafted. And we have to try to understand what Congress intended as the technology went forward. The Second Circuit obviously felt that this was an audiovisual work, and you said you didn't think it was correctly decided. Can you tell me specifically what about the reasoning of the Second Circuit is wrong? It was a different equipment, of course. Does that make a difference? Excuse me, Your Honor? It was a different device involved. Does that make a difference? Well, I don't think the different device is really what was determinative. I think what was determinative there is they were not looking at the – they never looked at the definition of audiovisual work. They never looked at the issue of related images and what that meant. And, you know, I think that in that respect the decision is, at least in that respect, effective for not having looked at the law to determine what's happening. And, you know, if we're trying to construe congressional intent, I think we've got to go and look at what a phono record is. A phono record is a very broadly defined, basically, sound recording, broadly defined as covering a device regardless of how it's done and the method of recording. So it was meant to be a very broad right to cover future technology. That was congressional intent. Let's go back to your suggestion that the Second Circuit got it wrong because it didn't look at the statute. Section 17 U.S.C. 101 says audiovisual works are, in quotes, works that consist of a series of related images. We certainly have that in your client's situation, which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment. I assume you would agree with that, together with accompanying sounds. Do you not have that as well? You've got music, if any, regardless of the nature of the material object, such as films or tapes in which the works are embodied. What is so strange about a construction of audiovisual works as encompassing exactly what your client's product does? Firstly, we do not have a series of related images. But the images are the lyrics. The lyrics are up there. They are put to exactly synchronize with the music. They are not related in the sense of the statute. The sense talks about images which are related intrinsically. Call it intrinsically, however you want it. The reality is that if the point of the song is, I love you, darling, and up on the screen it says, I love you, darling, how could that be more intimately related? Just because you can put words in the form of an image, the artistic content of the work is completely different from that in an audiovisual work, or what used to be the term there, motion picture. So you're saying that if the way in which the lyrics are displayed was done at a different time than when the song was composed, Cole Porter and his lyricists and so on, then it can't possibly be an audiovisual work? Is that what you're saying? The concept of synchronization is what your court is referring to. The concept of synchronization is not in the statute. I understand that. Okay. It just talks in terms of related. Right. In terms of related, we can define certain relationships. I could even define a related series of images that would come from still photographs. For example, look at the work of Ken Byrne, who did the Civil War, who did them with a lot of stills. But his camera panned across a 200-year-old or 150-year-old print and then zoomed in on a person and that sort of thing. Now, that's a situation where that is not a motion picture. That is not a motion picture. But the images there are related. Now, to say, and they're intrinsically related, it's intrinsic within the images. The relationship which the court is pressing at this point is the relationship not between the images but between the, how shall I say, the mental associations with the spoken words. So we're two steps away from related images. I respect your construction of this counsel, but I'm simply asking you, why is it unreasonable in construing this statute to understand it the way I have just postulated? Why is that unreasonable on its face? I know you have a different position, but why is it unreasonable? I think it's unreasonable because when the 9th Act was implemented, the public was given a broad right to make phono records, including the right under future technology, at least under the 76th Act, future technology was encompassed. One of those future technologies that was contemplated, perhaps the only really different one in many ways, is karaoke. And why should the public lose that right to be able to easily sing along with the latest tunes, so to speak, that comes out? Counsel, if I could ask one last question. You've suggested that one reason we shouldn't treat the lyrics as a series of related images is that the better definition of them is literary works. What follows from that proposition for you and your client here? Do you prevail if we determine the lyrics are literary works, or do you have some unrelated copyright problem with that? Do you contend that the compulsory copyright would cover literary works? I believe they are literary works, Your Honor. Lyrics are literary works. Nimmer characterizes them as literary work. It's been mentioned in the briefing. And if they are, what follows? What follows from that is there's a question of fair use, whether the use is fair. All right. Thank you. Thank you, Counsel. Your time has expired. We'll hear now from the other side. Thank you. Good morning, Your Honors. Karen Thorland for the appellees, BMG and Zamba. Just to begin with what seems to be the key issue of concern, at least on the compulsory license issue to the court of whether or not these images, whether or not lead singer's use and the work that it has created is an audiovisual work, we feel it clearly falls within the definition of the statute in Section 101. And as Counsel was talking to the court, he was moving the placement of the word intrinsic in the definition of audiovisual work. The definition requires only that the works consist of a series of related images. It doesn't say that they have to be intrinsically related, so he's making that requirement a little different. And here, clearly, the images, which are the lyrics, are intrinsically related. They're related to each other, and they are related to the music that is playing behind them. They need to be played in order to be meaningful. They need to be in sequence to make the device function in a way that allow users to use the device in the way the complaint says the device is used. The complaint says the lyrics allow the user to sing along, and obviously if they're not sequentially displayed in relation to the music, that would not occur. Counsel, your opposing counsel seems to or attempts to distinguish the APCO case out of the Second Circuit. What's your take on that case? I'm not aware of any reason why that case should be distinguished. The case is directly on point, and in fact the court did specifically quote the language from the audiovisual definition and specifically found that the lyrics, because there they weren't talking about images, they were only talking about lyrics, were a series of related images. And again, I think this is because they have to go in a certain sequence to be meaningful and they have to be connected to the music to be meaningful. And so I think the APCO reasoning is directly applicable here and that this court should reach a decision that's in line with the finding in APCO. Additionally, I think what's important to remember is that Lead Singer is making two uses of the lyrics. There's not a single use. The second use established in the complaint is that they're giving out printed hard copy booklets. And so I think it is meaningful that if we try to shove the lyrics only into the literary works category and say that it can never move from that, no matter how it's displayed, no matter how it's used, that Lead Singer is still in trouble because Lead Singer says in its complaint that it's using the lyrics in two ways and it's also giving a hard printed copy. And even the EMI case, EMI v. Pritis, which was a district court decision out of Utah and decided by Lead Singer in its reply, even that case recognizes that for using a printed version of the lyrics, you need a reprint license. So my question that I ask your opponent, I'll ask you also then, what follows from a determination that the lyrics, either in printed form in a separate setting or connected to the music, are literary works? You contend that a separate license would be needed for that and that your argument is they wouldn't come under the compulsory license? That's correct. I mean, the compulsory license gives a very limited right. It's a right to make what a layperson would call a cover. And you get one additional right in connection with that, and that's to do your own musical arrangement. It doesn't give any right to print lyrics. It doesn't give any right to display lyrics. I believe that the lyrics can change between the categories, that they can be in some instances part of an audiovisual work and in some instances a pure literary work. And that's in keeping with what Lead Singer describes in its complaint as the custom in the industry, which is to require three licenses, a mechanical license, a reprint license, and a synchronization license. And that's because you typically do have this printed book of lyrics as well as the… Synchronization refers to karaoke. Yes, to the karaoke use. Would you agree that Abco Music got it wrong when it said that these are not phonorecords because they include not just sounds but also visual representations? No, we believe that the court got it right and that the definition of phonorecords is narrow and it relates to the communication of sounds and… Is there anything in the statutory definition that limits it to only sounds? In the definition of phonorecords itself, no. However, I think you need to keep in mind the exclusive rights that are granted to the copyright holder and there's a distinction in the Copyright Act between phonorecords and copies. And one of the points that Nimmer makes actually in discussing this issue is that you may have a right to make a phonorecord and you don't have a right to make a copy. That means that you can't print the sheet music and the court should reach the same conclusion with respect to printing lyrics, that that would not be covered under any circumstance as a part of a phonorecord. When Liedsinger is describing the use of liner notes with respect to CDs, first, I would argue that that's irrelevant, but second of all, he's compressing the liner notes. It's as if they're part and parcel of the phonorecord and they're not. They're the container. And here you actually have the lyrics as part and parcel of the device, the module that's been created by Liedsinger. I'd like to also briefly at least address the fair use issue and I think one thing given the recent decisions from this court related to transformative use is that it's important to keep in mind that Liedsinger has never argued that its use was transformative. And that's not anywhere in the record below and it's not in the appellate briefing here, so I just wanted to point that out. And it's also important to keep in mind that in making an analysis of the character of the use, you need to focus on what Liedsinger itself has done and not on what end users may do with the product. And this court's made clear in the Tulo case and other cases that you focus on the use of the infringer or potential infringer and not on the end use. And that's in keeping with what's happened with respect to for-profit educational uses. Those have been found to be commercial uses. And so I think the focus is misplaced when we talk about taking the complaint as true that the end user is using a karaoke device for educational purpose, which I think is in and of itself questionable, but taking that as true. Isn't BMG's custom and practice to charge a synchronization license fee to karaoke producers, if you will, generally? In other words, are these folks out there isolated? Are there other people doing karaoke that are already paying the synchronization fee? Sure. I think you'll probably hear from some of them today. But I think also what's important to keep in mind is that this is a motion to dismiss. And in its own complaint, the plaintiff, Liedsinger, makes clear that BMG and other music companies have demanded a synchronization license, a mechanical license, and a literary reprint license. So I think that has to be taken as established in this case because it's included in the complaint. And it's included in the complaint in paragraphs 25 and 28. Why shouldn't the district court have allowed an opportunity to amend on the effect on a potential market? Well, first of all, I think what's important to note is that if you look back at Liedsinger's opposition brief in this case, which is part of the record, there was no request for leave to amend, and there was no facts put into evidence in this case, nothing in the record to suggest that any amendment could have been made. But I think the court, not reaching that issue, still found that taking the other elements together, what was established by the complaint with respect to the other three elements considered under the Act for Fair Use was sufficient to show that amendment would be futile. And the court made an express statement that amendment would be futile, which is sufficient under the Ninth Circuit authority on leave to amend. And I think it's also important to keep in mind the posture, the unique posture of this case, that this is a declaratory relief action and that Liedsinger has no right to a declaration in this case, that it's a discretionary matter, and that the trial court properly found that based on all the evidence in front of it, it would be futile to amend. Do you have any other questions? Thank you, counsel. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Smith, Mosman